ACCEPTED
03-14-00560-CR
5574630
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/8/2015 12:00:00 AM
JEFFREY D. KYLE
CLERK

# CAUSE NO. 03-14-00560-CR

**IN THE COURT OF APPEALS,
THIRD SUPREME JUDICIAL DISTRICT**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/8/2015 3:11:02 PM
JEFFREY D. KYLE
Clerk

_____

# CHRISTOPHER NEWBERRY
## Appellant
## VS.
# THE STATE OF TEXAS

_____

**Cause No. C1CR-14-209349, Travis County, Texas,
County Court at Law #5, Honorable,
Nancy Hohengarten, presiding**

---

# BRIEF FOR APPELLANT

Christopher P. Morgan
State Bar No. 14435325
3009 N. IH 35
Austin, Texas 78722
(512) 472-9717 FAX: 472-9798
chrismorganlaw@cs.com
ATTORNEY FOR APPELLANT

1

**NAME OF PARTIES/ATTORNEYS**

CHRISTOPHER NEWBERRY       Appellant

CHERYL HINDERA       Attorney for Appellant at trial
SBOT NO. 24007367
4425 SOUTH MOPAC, #107
AUSTIN, TEXAS 78735

CHRISTOPHER P. MORGAN       Attorney for Appellant on appeal
SBOT 14435325
3009 N. IH 35
Austin, Texas 78722

J. MICHAEL OHUERI       Assistant County Attorney at trial
SBOT NO. 24072529
P. O. BOX 1748
AUSTIN, TEXAS 78767

JENNIFER COLLITY       Assistant County Attorney at trial
SBOT NO. 24062974
P. O. BOX 1748
AUSTIN, TEXAS 78767

**TABLE OF CONTENTS**                                    **PAGE**

NAME OF PARTIES/ATTORNEYS                                 2

TABLE OF CONTENTS                                        3

INDEX OF AUTHORITIES                                     5

STATEMENT OF THE CASE                                    8

POINTS OF ERROR                                          8

ARGUMENT AND AUTHORITIES                                 9

POINT OF ERROR NO. ONE: THE EVIDENCE IS
INSUFFICIENT.                                            9
    A. Evidence.                     9
        1. Ebony Knox.      9

        2. SX-5 (the 911 calls).     9

        3. APD Officer Joseph Poswalk.     10

        4. Justin Giddings.     14

        5. SX-8 (police videos).     18

        6. Appellant Christopher Newberry.     19

    B. Arguments.                     25
        1. No direct evidence.     26

        2. Appellant did not admit driving or
          driving while intoxicated.     28

        3. Murray v. State.     34

        4. Insufficient to prove driving or
          operating.     36

5. Insufficient to prove, if driving, that he
was intoxicated when doing so.                    38

POINT OF ERROR NO. TWO: THE TRIAL COURT
REVERSIBLY ERRED BY DENYING APPELLANT'S
MOTION FOR MISTRIAL.                              40
    A. Record.                                   40

    B. Argument.                                 49
      1. By eliciting this evidence the State violated
appellant's rights to due process, fair trial
and the presumption of innocence.                49

      2. The trial court erred by denying the motion
for mistrial.                                    51
        a. Severity of the misconduct.               52
        b. Curative measures.                        52
        c. Conviction was not a certainty.           55

      3. The error was not harmless beyond a
reasonable doubt.                                55

PRAYER FOR RELIEF                                 56

CERTIFICATE OF SERVICE                            56

CERTIFICATE OF WORD COUNT                         56

**INDEX OF AUTHORITIES**                                          **PAGE**

**Cases**

Archie v. State, 340 S.W.3d 734(Tex.Crim.App.2011)            53

Arocha v. State, No. 12-14-00042-CR(Tex.App.-Fort Worth,
    December 11, 2014)[unpublished].                       31, 32, 33

Avants v. State, 170 Tex.Crim. 308, 340 S.W.2d 817(1960)      36

Ballard v. State, 757 S.W.2d 389(Tex. App.-Hou[1st]1988)
    pet. ref'd                                            30, 32, 40

Barton v. State, 882 S.W.2d 456(Tex.App.-Dallas 1994) no
    pet.                                                  40

Brooks v. State, 323 S.W.3d 893(Tex.Crim.App.2010)           25

Brown v. State, 877 S.W.2d 869(Tex.App.-San Antonio1994)
no pet.                                                       49, 50, 51,
             52, 55, 56

Bucek v. State, 724 S.W.2d 129(Tex.App.-Fort Worth1987)
    no pet.                                               31, 33

Chaloupka v. State, 20 S.W.3d 172(Tex.App.-Texarkana
    2000), pet. ref'd                                     39

Coble v. State, 330 S.W.3d 253(Tex.Crim.App.2010)            51

Deck v. Missouri, 544 U.S. 622, 630, 125 S.Ct. 2007 (2005)   50

Emerson v. State, 880 S.W.2d 759(Tex.Crim.App.1994)          36

Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691 (1976)      50

Feinberg v. State, No. 05-06-01367-CR(Tex.App.-Dallas,
    November 20, 2007)[unpublished]                       40

Folk v. State, 797 S.W.2d 141(Tex.App.-Austin1990) pet.
    ref'd                                                 31, 32, 33

Geick v. State, 349 S.W.3d 542(Tex.Crim.App.2011)            26

Hacker v. State, 389 S.W.2d 860(Tex.Crim. App.2013)          30

Hamilton v. State, No. 14-08-00175-CR(Tex.App.-Hou[14th]
    2010)[unpublished]                                    51, 53, 54

Hanson v. State, 781 S.W.2d 445, 446(Tex.App.-Fort Worth
    1989), *abated* 790 S.W.2d 656(Tex.Crim.App.1990)    31, 33

Hawkins v. State, 135 S.W.2d 72(Tex.Crim.App.2004)           56

Hearne v. State, 80 S.W.3d 677(Tex.App.-Hou[1st]2002)
    no pet.                                               37

Holloway v. State, 446 S.W.3d 847(Tex.App.-Texarkana
    2014) no pet.                                         50, 52

Hooper v. State, 214 S.W. 3d 9(Tex.Crim.App.2007)            26

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781(1979)    25

Keenan v. State, 700 S.W.2d 12(Tex.App.-Amarillo1985)
    no pet.    36

Kuciemba v. State, 310 S.W.3d 460(Tex.Crim.App.2010)    37, 38

Madden v. State, No. 02-08-007-CR(Tex.App.-Fort
    Worth2009)[unpublished]    53

Malik v. State, 953 S.W.2d 234(Tex.Crim.App.1997)    26

Mendoza v. State, 1 S.W.3d 829(Tex.App.-Corpus Christi
    1999) pet. ref'd    56

Milam v. State, 976 S.W.2d 788(Tex.App.-Hou[1st]1998)
    pet. ref'd    39

Murray v. State, No. PD-1230-14(Tex.Crim.App., April
    15, 2015).    26, 34

Murray v. State, 440 S.W.3d 927(Tex.App.-Amarillo2014),
    *rev'd*, No. PD-1230-14(Tex.Crim.App., April 15, 2015)    34

Oliver v. State, 999 S.W.2d 596(Tex.App.-Hou[14th] 1999)
    pet. ref'd    49, 52, 54
    55

Onyekachi v. State, No. 05-12-00519-CR(Tex.App.-Dallas
    2013)[unpublished]    31, 33

Pierce v. State, 234 S.W.3d 265(Tex. App.-Waco2007) pet.
    ref'd    50, 52, 53

Randle v. State, 826 S.W.2d 943(Tex.Crim.App.1992)    50, 52, 55
    56

Rodriguez v. State, No. 01-08-01038-CR(Tex.App.-Hou
    [1st]September 29, 2009)[unpublished]    40

Scillitani v. State,315 S.W.3d 542(Tex.Crim.App.2010)    39

Scillitani v. State, 297 S.W.3d 498(Tex.App.-Hou[14th]
    2009), *rev'd*, 315 S.W.3d 542(Tex. Crim.App.2010)    33

Sharper v. State, 22 S.W.3d 557(Tex. App.-Texarkana2000)
    no pet.    50, 53

State v. Pringle, No. 12-12-00286-CR(Tex.App.-Tyler, June
    23, 2013)[unpublished]    50

Threet v. State, 157 Tex.Cr.R. 497, 250 S.W.2d 200(1952)    31

Wiseman v. State, 223 S.W.3d 45(Tex.App.-Hou[1st]2006)
    pet. ref'd.    52, 55, 56

Wright v. State, 932 S.W.2d 572(Tex.App.-Tyler1995) no pet.    37, 39

Youens v. State, 988 S.W.2d 404(Tex.App.-Hou[1st]1999)
    no pet.    39

Zavala v. State, 89 S.W.3d 134(Tex.App.-Corpus Christi
    2002) no pet.                           33

***Statutes, Rules & Publications***
*Tex.CodeCrim.Proc.*, Art. 2.03(b)           49
    Art. 38.03           50
    Art. 37.07, Secs. 4         54

*Tex.PenalCode,* Sec. 49.04(a) & (b)      8

*Tex.R.App.Proc.,* Rule 44.2(a)        55

*Texas DWI Detection and Standardized Field Sobriety*
*Test Program: Student Manual* (Revised 01/ 2002)    35

**CAUSE NO. 03-14-00560-CR**
**IN THE COURT OF APPEALS, THIRD SUPREME JUDICIAL DISTRICT**
_____

**CHRISTOPHER NEWBERRY**
**Appellant**
**VS.**
**THE STATE OF TEXAS**
_____

**Cause No. C1CR-14-209349, Travis County, Texas, County Court #5, Honorable, Nancy Hohengarten, presiding**
_____

**BRIEF FOR APPELLANT**
TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW, CHRISTOPHER NEWBERRY, appellant, and submits his brief in Travis County Cause No. C1CR-14-209349, and shows:

**STATEMENT OF THE CASE**
On or about August 7, 2014, on plea of not guilty, a jury convicted appellant of driving while intoxicated, a class B misdemeanor. *Tex.Penal Code*, Sec. 49.04(a) & (b). The court assessed sentence of 120 days Travis County jail, no fine. *Motion for New Trial* apparently was timely filed. *Notice of Appeal* was filed prematurely on August 28, 2014, and *Amended Notice of Appeal* was filed October 14, 2015 (correcting defendant's name in the body of the *Notice*). The reporter's record was filed December 16, 2014. After extensions of time to file, the brief was filed June 8, 2015.

**POINTS OF ERROR**
**POINT OF ERROR NO. ONE: THE EVIDENCE IS INSUFFICIENT.**

**POINT OF ERROR NO. TWO: THE TRIAL COURT REVERSIBLY ERRED BY DENYING APPELLANT'S MOTION FOR MISTRIAL.**

**ARGUMENT AND AUTHORITIES**
**POINT OF ERROR NO. ONE: THE EVIDENCE IS INSUFFICIENT.**

The information alleged in relevant part that appellant "on or about June 9, 2014, did then and there operate a motor vehicle in a public place in Travis County, Texas, while intoxicated." RR3-2-3. Appellant pleaded not guilty. RR3-3.

**A. Evidence.**
**1. Ebony Knox.**

Knox testified she was custodian of records for the Austin Police Department ('APD'). RR3-8-9. The State then introduced copies of recordings of three 911 calls as State's Exhibit ('SX') 5, which she described as "callers stating that there was a drunk driver," "described… the vehicle that he was driving," and "the street was Mesa." RR3-9-11. On cross she added that the calls came in between "1600 to about 1735" hours, 4 to 5:35 p.m.; the first around 4:23, the second "around the same time, a couple minutes difference, maybe. And then the third… about an hour later." RR3-12-13.[1]

**2. SX-5 (the 911 calls).**

SX-5 was played for the jury at RR3-11. All three 911 calls were from females.[2] None identify or describe the driver, or contain anything

---

[1]/ The State originally said there were 2 calls on it, Knox testified it was 3. RR3-10-11. It also elicited that the 'factors' used to connect the calls to one incident are "[w]hat's in the call, the description of the vehicle, the location of the -- and the location." RR3-11.

identifying appellant as the driver. The first two put the car turning onto Mesa and into Summit Assisted Living. The first stated she was "pretty sure there was a drunk driver in front of" her, in a Maroon jeep, license plate BMT5040, and described the driving as *inter alia* "swerving", "almost hitting the curb" twice and "he hit the guardrail, ran off the road four times".

The third was from a receptionist at Summit Assisted Living on Mesa, saying *inter alia* a brown jeep was parked over the sidewalk and "someone just told us he looks like he's on drugs or drunk… he's still in the vehicle". She went to look for herself, and on returning said she was told "he is not in the vehicle and the person who reported this just said he was out stumbling around, so he may have gone behind our building." There is no indication she saw if anyone was in the Jeep, or asleep in it.

### 3. APD Officer Joseph Poswalk.

APD officers Poswalk and McBride were the first to arrive at 5715 Mesa Drive in Austin, "[s]ometime around 6:00 p.m." RR3-25, 29.[3] That was in response to "a suspicious person call, of a jeep parked over a sidewalk at, I believe, a retirement home at this address, with the driver still

---

[2]/ There was no other information identifying the first two callers and the second refused to give her name.

[3]/ By time of trial, Poswalk had been an peace officer a "little over two and a half years", including 8 months at the academy. RR3-14-15. Poswalk's in-car video shows a time-stamp for that of 7:02 pm (19:02); McBride's shows a time-stamp of about 5:45 pm, but there is nothing showing how accurate those were.

inside." RR3-23. "[T]here was a jeep parked," in the first parking space in the parking lot "like the call said, over the sidewalk." RR3-23-24. He testified this was a public place. RR3-29.

The State then introduced and published four photos as SX-1 to 4. RR 3-24-25. They show a Jeep, plate number BMT5040, parked in a marked space with the front half over a sidewalk. SX-1 also shows the retirement building, separated from the sidewalk by a hedge and lawn, and much of the rest of the lot and other parked vehicles. SX-2-4 also shows a road a good distance to the east, separated from the parking lot by a large lawn-type area, and part of the driveway. *See also*, RR3-23.[4]

McBride walked "up to the driver's side door", Poswalk walked "to the passenger side door." RR25-26. McBride said there "was someone in-side", and "knocked on the window until the defendant woke up." RR3-26. Appellant "was very wet, either sweaty, or what. He was drooling on him-self and he had his keys in his lap." RR3-26. He thought the passenger side window was "rolled down slightly." *Id. See also*, SX-2.

They did not see appellant driving, and the keys for the Jeep were on appellant's lap. RR3-33.

---

[4]/ Google Earth satellite photo actually shows that road is a driveway coming off Mesa.

11

They "had him step out" of the jeep "and sit on the curb." RR3-27. Appellant did not have "trouble getting out... But taking the small walk to the curb, he had impaired balance." *Id*. He

> "did appear impaired, like — he definitely wasn't all there. His speech was very — you couldn't even make it out. It kind of came and went. Like he'd speak clearly and then he'd kind of mumble."

*Id*.

Poswalk then related "a message" he received "from another officer" while driving to Mesa, about

> "a call previously, before I had gotten to work, … of a purple or brown jeep heading, I believe, westbound on 2222, that had struck a guardrail or wall. This officer had tried to find it and never did. So when this call came out, he sent me a message, Hey, you know, this is more than likely the vehicle from earlier."

RR3-27. He added that, at some point, McBride contacted "the person that had called … to see if he could come and identify the driver." RR3-28. The State asked if they confirmed "this was, in fact, the vehicle", and Poswalk said they had him "drive by" and "take a look at the defendant, … So when he drove by, he immediately said, Yeah, that's him." *Id*.[5]

After reviewing SX-1-4, Poswalk testified that there "was some" damage to the Jeep "on the back right bumper. … there looks like a scratch

---

[5]/ On cross, Poswalk identified this person as Robin Brown, a male, "Somehow he ended up being — we had his number from dispatch as a witness." RR3-31. It is clear from the recordings that all 911 callers were in fact female, so he was not one.

on the right front bumper.  But" couldn't tell whether the damage was there prior or not" or had anything to do with "graz[ing]" a guardrail. RR3-31-32.[6]

They decided to have appellant perform standardized field sobriety tests (SFSTs) and waited for officers Giddings and Adams "to come up and take the investigation from there." RR3-28.[7]  Poswalk remained there after they arrived, but did not participate in **"conducting the SFSTs"**. RR3-30. Nor did he testify that appellant was intoxicated.[8]

After appellant was arrested, a search of the jeep produced "two open beer cans" inside in the center console, and "a small cooler with, I think,

---

[6]/ "A. Yeah. It depends. He was going westbound. So it would have been that right side, if he was in the right lane, which, again, I don't know. In that area, there are quite a few guardrails and cement walls, as well. Whether he had grazed or — you know, I couldn't tell you. It's possible that that damage came from the wall. It's possible that it was there prior. I couldn't tell you whether that was definitively guardrail damage or something else." RR3-32-33.

[7]/ "Officer Adams, who [was] the field training officer for Officer Giddings," contacted them and asked if Giddings could do the SFSTs. RR3-28-29. Poswalk did not recall how long they took, it was more than a couple of minutes. RR3-29.

[8]/ He did testify that officers get training at the academy on detection of intoxication and a 3 month field training period with another officer after graduation. RR3-15-16.  That in-cludes training and certification on the SFSTs (horizontal gaze nystagmus test (HGN), walk-and-turn and one-leg stand). RR3-16-17.  The defense did not object when the State moved "to qualify him as an expert in conducting the standardized field sobriety tests" ('SFST'). RR3-17.  He said *inter alia* the HGN has 6 possible clues (3 in each eye), and "four or more clues" on the HGN means "it's 80 percent or more chance that they're intox-icated, above the legal limit." RR3-20.  He added that "from my experience, you don't see too much vertical gaze nystagmus just from alcohol. Usually, there's something else in the system that can trigger the vertical gaze nystagmus." RR3-20.  He also said officers look for "2 or more" clues on the walk-and-turn, and "[t]wo of four" on the one-leg stand indicate intoxication RR3-22-23.

three more cold beers inside of it." RR3-30. "[S]ome of them had a little bit left in them. I think there was one that was completely empty." RR3-33. He also "had his tools in there. He said he was a subcontractor, so there was a lot of tools" and some clothes. *Id.* He had said he was at work that day. *Id.*[9]

### 4. Justin Giddings.

Giddings graduated the academy on March 22, 2014, about 2 and a half months before this incident. RR3-34-35. He was called to do the SFSTs. RR3-36.[10] His video shows he arrived about 6:15 p.m. *See*, SX-8(#181547). *See also*, RR3-40.

Giddings thought appellant's clothes "were sort of disorderly", but agreed it was "possible, if you're working construction, to be disheveled like" that. RR3-38, 63. When he spoke with him, Giddings "smelled a faint odor of alcohol", "speech was slurry and kind of mumbled", and "eyes were glassy and watery. And his pupils were very restricted". RR3-38.

He asked appellant "a standard list" of questions, "standard to my-self". RR3-38-39. In reply, appellant estimated the time as "six o'clock,

[9]/ McBride was not present during trial as he "no longer at the department" and had "moved out of state." RR3-31.

[10] / He was a certified SFST practitioner. *Id.* His training consisted of "a 40-hour week dedicated to SFSTs" at the academy, "lectures. We read from the manual. And we also did a hands-on application at the end of the week." *Id.* At the time of this stop, he was "about two full months" into 3 month field training, Adams was his training supervisor. RR3-37, 42. *See also*, RR3-63-64.

when it was more around 6:30", and later "began saying he thought it was 4:00 to 4:30, closer to that time." RR3-40-41.  He said "he was heading home", gave the address only as "In Austin", "said he was coming from work", "left at 2:00" and "came straight from work and did not stop any-where", but "that's when the time started changing a little." RR3-39, 41. His last meal was a "breakfast sandwich… that morning", he denied drink-ing alcohol, and "said he had about two gallons… of water that day while working." RR3-40-41.

Giddings had him do the SFSTs (HGN, walk-turn, 1-leg).RR3-37, 45. It "didn't seem like" appellant had done them before. RR3-64.  He said he saw all three clues in each eye on the HGN, "vertical nystagmus" and "swaying", "[s]ix out of eight" clues on the walk-and-turn, and "[f]our out of four" on the one-leg. RR3-47, 52.[11]

No alcoholic beverages where found on appellant, but Adams and Poswalk did find "two open and a couple of closed… taller sized beer cans", "probably 24 ounces" in the Jeep. RR3-42-43.  SX-6, 7 and 8 were introduc-ed at RR-43-45.  SX-6 is a photo of the parked jeep, SX-7 is a 'screen cap-ture' from the police video showing officers with 5 beers cans, SX-8 is a copy of the police video recordings.

---

[11]/ He explained the tests and related the instructions he gave appellant at RR3-46-53.

Once his investigation was finished, Giddings made a "judgment call" appellant "was driving while intoxicated." RR3-52-53. At that time, Adams asked "if he would provide … a portable breath sample" (PBT). RR3-53-54. Appellant declined. *Id*.[12]

The State then elicited that when Giddings first approached him, appellant "was cooperative, able to talk to" but "very quickly became very agitated", and by the time they asked for the PBT his attitude was "[v]ery aggressive in a way",

> "He kept asking, for instance — during one point, he asked if we wanted him to do cartwheels, as well. And it was just — it was hard to keep his attention. And at one point, he did admit that he has trouble with authority. And he apologized for it. And it was just — he'd be cooperative for a couple seconds and then go back and forth."

RR3-54. He opined that, from his experience, such "sudden changes in attitude" may be an indication of intoxication. *Id*.

After he refused the PBT, appellant was handcuffed and searched "incidental to arrest", producing a "couple of tools and a pocketknife". RR 3-54-55. He was placed in the back of Giddings car, who "read him the DIC-24", "provided a copy" and "told him he could follow along with it."

_____

[12]/ Giddings said "that's by policy. We are required to ask them if they will give that or not." *Id*. He explained "[i]t's a preliminary breath sample. So it's not as accurate as the Intoxilyzer that's at the jail, but it does provide a sample that is close to what the actual blood alcohol concentration is." *Id*.

RR3-55.[13]  Appellant listened at first, but then repeatedly interrupted, with profanity "several times". *Id.*

Appellant did say he would provide a sample when they got to the jail. *Id.*  However, he refused when the intoxilyzer operator asked, and "began to become very aggressive with the jailers", "the jailers take him up to do the intake process, at which time he starts getting mouthy with them," to the point where "he was kept in handcuffs and placed in a solitary cell, by himself", when RR3-55-56, 60.

The State then published the recording from Giddings' car on SX-8. RR3-56-59.[14]  *See*, 5, *post.*

On cross, Giddings testified he did not see appellant driving, or even behind the wheel, when he arrived "he was sitting on the sidewalk behind his vehicle." RR3-61.  The day "was cloudy, kind of overcast", "maybe in the 80s". RR3-63.  He did not physically touch any cans and did not know if they were warm or cold, but "the other officers said they were cold to the touch, and two of them were opened and half empty." RR3-62.

He also related how appellant had said 'something like "Mesa Drive. Oh, that's where I am"', when they were leaving, and "[s]eems like he did

---

[13]/ Giddings explained the DIC-24 is "basically letting the subject know their rights and everything. And at the end, you're asking for a sample of their breath or blood." RR3-55.
[14]/ At one point while playing it the State pointed out some swaying by appellant, which Giddings estimated was "a couple inches." RR3-58-59.

not know where he was at the time". RR3-65.  Appellant "said he was com-

ing from work that day", and the tools police took from his pocket could

have been used in his work. RR3-66.

### 5. SX-8 (police videos).
While the DVD introduced as SX-8 has 4 videos on it, the State only

laid the predicate for Giddings' video (#181547):

> "Q Do you recognize that Exhibit 8.
> A Yes, sir.  It is a copy of our video from that – my video from my
> patrol vehicle from this case.

RR3-44.  Indeed, from his testimony, it appears no one knew the other

videos were on SX-8.  His is also the only video the State published to the

jury. RR3-56-59.  There was no mention during trial that there were other

videos or they were on the it.[15]

There is no transcript in the record, so the following is as best as

appellate counsel can do.  The numbers for each entry *post* are approximate

time stamps.  Putting evidence on intoxication aside, the statements by

appellant that seem most relevant are thus:

---

[15]/ Of the four videos on SX-8, only Giddings and McBride's (#174346)  contain relevant
information.  McBride was not available for trial, having moved out of State.  Poswalk
was not asked to authenticate SX-8 or anything on it, but only SX-1-4. RR3-14-33.  It is
not clear he could have done so.  His video (#190311) is less than 2 minutes long and
only has the audio at the beginning of McBride's where the officers talk about the keys
not being in the ignition.  Officer Witt's (#174806) seems merely a poorer quality
recording of some of the audio also on McBride's.

-@18:19:30 "O: How did you end up here?
A: Um, driving?

O: So you were driving but what brought you to end up at this location?
A: I have no a/c in my vehicle, hot, this day I'm working a lot… I really, really don't know.  I'm being honest with you."

-@18:48:55 "A: No one seen me drive.  I did not drive either…
Somebody drove me, dropped me off."

The State rested after Giddings' testimony. *Id.* Appellant's motion for directed verdict was denied. RR3-67.

### 6. Appellant Christopher Newberry.
Appellant admitted he is the person in the video and was "intoxicated" at that time. RR3-80. *See also*, RR3-85.  He testified he resided in Austin on June 9, 2014. RR3-71.  He "had very little sleep" that night, because he was up until 3:00 a.m., working on his Jeep. RR3-69.  He had it inspected at 8:00 a.m., then drove to the construction and recycling business he worked at near Lakeway, "started about 9:00-ish, probably". RR3-70-75.[16]  It is "hard physical labor", done outside. RR3-69.  It "was very hot and humid that day. It was in the high 90s." RR3-71.  Two gallons of water was a normal amount for him to drink during work. RR3-71.  He "was extremely tired the whole day." RR3-70.

He thought he stopped work "probably about 3:30",  but was "really

---

[16]/ "[I]t's still in Austin, but it's literally like two blocks from Lakeway." RR3-72.

foggy" about that because he "started drinking at noon" since he had planned to sleep in a cabin the company had there rather than drive home. RR3-70, 71.[17] He had a 24-ounce beer and said he "wasn't drinking a lot; … Almost as much as my body actually, I'd say, goes through alcohol wise, you know, with water also." RR3-73-75.

About two o'clock, a coworker, Juan, "got a call", "he said that a girlfriend called him… and that he wanted to go into Austin… but he doesn't have a vehicle." RR3-74. *See also*, RR3-70.[18] The call "was probably about one an hour" after he started drinking. RR3-75. Juan had also been drinking, but appellant decided to let him drive. RR3-75-76. He was not sure what time they left. RR3-76. On redirect, he estimated 3:30, but it could have been 3 or 4. RR3-108.

He insisted Juan was driving, not him. RR3-77. He testified that on the video the officer

> "asked, 'Where were you going?' I told him where I was going. He asked later on, 'How did you get here?' And I didn't know how to answer the question. I hesitated, and I said driving. That's like

---

[17]/ "It was because I'd been up all night and I agreed with Ann that I was going to crash and burn that day, just finish what I was doing, load up the trucks, and just go to sleep. I wasn't planning on leaving Lakeway." RR3-74.

[18]/ Appellant described Juan as "an illegal alien, but he's worked for Ann for over five years. And he got deported. He's been back for about six months." *RR3-74.* He did not know Juan's last name. *Id.*

asking a bird how does it go south?  Flying.  I didn't say I was driving. I was not driving the vehicle."

*Id.*  He said he did not drive because he "was intoxicated.  And []had a CDL and clean driving record for over 14 years.  I do not drive intoxicated.  I was not going to drive intoxicated." *Id.*[19].

Juan was supposed to drive him to his house, and then "was going to either take a bus or his girlfriend was going to come get him." RR3-79-80.

> "He's well trusted. He's worked for Ann for over five years. She has two company vehicles; he drives both of them.  He 's just not legally able to drive.  So it really doesn't matter whether he gets a DWI or not.  He just gets deported.  He always comes back."

RR3-77-78.

Appellant said he was sitting on "the passenger side" and went to sleep at some point. RR3-78.  He started on a beer before that, but did not drink much: "Not really.  I opened one.  And it sat in the console because I went to sleep. … Juan was drinking. That's why there was two." RR3-81.  He did not recall the drive to Mesa or know how they got there, as he was asleep. RR3-78.

> "I do not recall anything.  I mean, I crashed hard.  I went to sleep.  The next thing I remember, actually, is waking up.  He was not — he was not in the driver's side.  I was pouring sweat.  Keys were in the ignition and the window was up on his side.  And the door's kind of

---

[19]/ He explained that is a "Commercial Driver's License", and he had "[f]ourteen years with a clean record." *Id*. See also, RR3-109-110

messed up on the driver's side of the jeep. I never got out of the jeep. That's what also made me wonder about the 9-1-1 video. Someone stumbling around drunk. That had to be Juan because I never got out of the jeep. I moved into the driver's side. The reason I say that I never got out of the vehicle is because the door's — it's on the video. I told the officer that the door gets stuck. So anyway, I got to the driver's side without getting out of the vehicle to roll the window down and that's when I clipped the keys--"

RR3-79. As for "the guardrail stuff, I have no idea. I was asleep anyway so I have no idea about any of it." *Id*. [20]

He testified he had no idea how long the Jeep was parked "because I fell asleep and I didn't know how long I was asleep." RR3-80-81. Asked where Juan went, he replied: "I only know from later, is that he went and visited someone there in the complex." RR3-81-82. [21]

Asked why there was cool beer in the car after two hours, he said: "As the officer stated, there was a cooler with ice in it in the vehicle." RR3-82. He had "no idea" if the beers in the console were cool: "I have no idea. I quit drinking for a while. I was sleeping." RR3-83.

He agreed that he was in the driver's seat and had the keys in his lap when the officers woke him. *Id*. He explained he had

---

[20]/ He explained that the passenger door is stuck because of problems with its handle and not for some other reason. *Id*.

[21]/ While the State objected, it was after the answer, they did not request an instruction to disregard or strike and the court did not do so *sua sponte*. RR-82. He also twice tried to say that Ann and Juan told him Juan drove there and left him in the jeep, but the State's hearsay objections were sustained. RR3-78, 80.

"climbed over the seat to roll the window down. There's a lot of defects in the jeep. … You have to literally push against the glass and roll it down. And I had to be in the driver's side seat to roll the window down."

*Id.*

He said the damage to the Jeep "happened months ago." RR3-84.

"It was a cement pylon or bridge I backed into at the river, almost two months ago. And as you can see in the picture, this taillight's been replaced. It's not the same as the other. It's quite obvious it's a very old accident." *Id.*

He did not repair the bumper because he "didn't feel it was necessary." *Id.*

On cross, the State elicited that there were a lot of details he did not remember, and he had to "speak with other people… such a Juan" to refresh his recollection. RR3-85-86. He added that "the only reason" he "could say as to why I was there was by finding out why Juan drove there, and he was there to visit someone there." RR3-85. When the State expressed skepticism that he crossed to the driver's seat, he replied: "I was covered with sweat, as you can see in the video. I was dying of sweat." RR3-86.

It then opened the line of questioning addressed in *Point of Error No. Two*, *post*. Ultimately, it was allowed to prove he had a prior felony bribery conviction. RR3-99-100.

Appellant conceded he did not mention Juan or Ann to the officers.

RR3-100.[22]  He said he told them he "didn't know how I got there," and added: "All I know, I was driven there.  That's the answer.  How did I get to where I was, I don't know because I didn't--" *Id*.  He agreed memory loss is consistent with intoxication "on occasion", but added "with sleeping too". RR3-101.  He also agreed "dislocation" is consistent with intoxication. *Id*.

He acknowledged that when the officers asked how he got there, he only said "driving". *Id*.  He did not think that would have been a good opportunity to mention Juan or Ann. RR3-102.[23]  He admitted it had been "[c]lose to" 60 days since the incident, he had had that time to think about whether to testify, what he would say and what might be favorable and unfavorable. RR3-102-104.  He agreed it would be "pretty favorable" if the jury believe he was not driving. RR3-104-105.

He testified he did not understand Giddings was going to conduct a DWI investigation when he first came to him,

> "not at that time. I thought that I was — he actually asked — I wanted to see if he had the ability to drive.  I didn't know if I was going to be charged with a PI or not.
>      …
> He did not state that I was being charged with a DWI at the beginning of that."

RR3-105.  He was aware he suspected he was intoxicated. RR3-105-106.

---

[22]/ When he asked if they wanted to know the reason, the prosecutor replied 'no'. *Id*
[23]/ The State again said "no" when he asked if they wanted to know why. *Id*.

He conceded he had an opportunity to give what he thought was a favorable or unfavorable answer when Giddings asked if he had consumed any alcohol and he told him he had not. RR3-106-107.

On re-direct, he testified he was in condition to safely drive at noon that day and "probably could have" at two o'clock, "but it would have been beyond the legal limit, which is pretty -- .08 is one beer." RR3-107. He agreed he was in no condition to drive when the officers arrived, but was asleep, not driving and had no intent to operate a vehicle at that time. RR3-108. He did not mention Juan to the officers

> "Because I didn't want him — for one thing, I didn't want him getting charged with a DWI if he was around. It came up in the 9-1-1 video that someone was drunk and stumbling. As the jury can see, I was intoxicated, but I was not inebriated to the point of falling down drunk, is the way the lady called it in on the third and last 9-1-1 call. That was probably Juan. He would go to jail if I would have said anything."
> …
> And I wasn't considering myself — I thought the law, at the time, was if you're in your vehicle with the keys out of the ignition, you get a PI, not a DWI."

RR3-108-109.[24]

**B. Arguments.**
Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781(1979), provides the standard for sufficiency. *See*, Brooks v. State, 323 S.W.3d 893, 894-95(Tex.

---

[24]/ Both sides then rested and closed. RR3-110.

Crim.App.2010). The evidence is viewed in the light most favorable to the verdict to determine if a rational trier of fact could find each essential element beyond a reasonable doubt. <u>Jackson</u>, 99 S.Ct. at 2789; <u>Brooks</u>, 323 S. W.3d at 899.[25] The factfinder resolves conflicts in testimony, weighs the evidence and draws reasonable conclusions from basic facts. <u>Murray v. State</u>, No. PD-1230-14(Tex.Crim.App., April 15, 2015). Appellate courts "determine [if] the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* The fact finder's resolution of conflicts in the evidence must be rational and inferences drawn reasonable. <u>Hooper v. State</u>, 214 S.W.3d 9, 15-16(Tex.Crim.App.2007). A conclusion reached by speculation may not be completely unreasonable, but is not sufficient to support a reasonable finding beyond reasonable doubt. *Id.* That there is only 'some evidence' supporting guilty inferences on each element is not sufficient. <u>Jackson</u> expressly rejected the 'no evidence' test. <u>Brooks</u>, 323 S.W.3d at 916-17 (Cochran concurring).

### 1. No direct evidence.

---

[25]/ Sufficiency is measured on a hypothetically correct jury charge. <u>Malik v. State</u>, 953 S.W.2d 234, 240(Tex.Crim.App.1997). That is one accurately setting out the law, authorized by the charging instrument, not unnecessarily increasing the State's burden of proof or restricting theories of liability, and adequately describes the particular offense tried. <u>Geick v. State</u>, 349 S.W.3d 542(Tex.Crim.App.2011).

The first two 911 calls were at about 4:23 p.m. At that time, appellant's jeep was seen being driven recklessly, then turning onto Mesa and at the Summit, where it was later found parked. Neither caller identified or described the driver. At least one speculated about a 'drunk driver', but neither actually had any basis to attribute a cause to the driving. As defense counsel argued, the second caller used "they" a number of times in her description, suggesting she might have seen multiple occupants. RR3-114.

The third 911 call came in around 5:30 p.m., over an hour after the jeep was last seen moving.[26] The woman reported another person told her it was parked where and in the manner officers found it. Almost immediately, after she went out to look for herself, she related that she did not get close to the vehicle but did not see anyone in it, and "the person who reported this" said he was "stumbling around" but she did not see anyone so they might have "gone behind" the building.

Poswalk and McBride arrived around 6 p.m., or about 1 hour and 40 minutes after the jeep was seen moving. The engine was not running and there is no evidence it was hot or operated during that time. No occupants can be seen in the jeep on the video, let alone in the driver's seat. Nothing

---

[26]/ Knox said it was "about an hour" after the second 911 call, Poswalk said he and McBride arrived at Summit about 6 p.m., "probably 20 minutes or so" after dispatch called them. RR3-12-13, 23-24.

indicates the officers saw anyone in it until they were standing near it, when McBride indicated there "was someone inside". Appellant was in the driver's seat, asleep, with the keys in his lap, apparently slumped over in such a way he could not be seen until they got close.

There is no direct evidence he had been driving at any time since 9:00 a.m. or when he might have been intoxicated. While Poswalk testified he contacted a caller, who "drove by" and "said, Yeah, that's him", it is obvious he was mistaken or overstated that. All three callers were female, the person Poswalk spoke to was male. Neither caller who saw the driving saw the driver, the third caller never saw any driving or operating, and that call shows thejeep was parked when first reported there. Further, Poswalk related he asked the person to drive by and confirm "this was, in fact, the **vehicle**", so he was identifying the jeep, not the person.

**2. Appellant did not admit driving, or driving while intoxicated.**

Appellant testified he was not the driver, but a passenger while Juan drove from Lakeway to the Summit, where Juan "went and visited someone" while he continued sleeping in the jeep. At one point, he woke from the heat and moved into the driver's seat to try and lower that window. It was June. He testified it was hot and humid, he thought in the 90s;

Giddings said it was in the 80s.[27] He and the officers testified he was sweating heavily. SX-6 seems to show that window down a bit, SX-2 and 3 show the passenger window partly rolled down.

Near the end of Giddings' video, appellant appears to say:

"No one seen me drive. I did not drive either… Somebody drove me, dropped me off." @18:48:55.

Therefore, the State's argument that his testimony was the first time he mentioned being a passenger is incorrect. It is true he said this when in the police car and not to the officers, but there is nothing indicating he knew it was being recorded and, as the saying goes, the truth is often said in private. *See e.g*, Luke 12:3.[28]

Giddings testified appellant told him he was "heading home" from Lakeway, "left at 2:00 p.m." and "came straight from work and did not stop anywhere". But that is not a statement that **he** was driving, as opposed to someone else, only about the direction and path taken by the car. The only possible statement otherwise appears to be thus:

---

[27]/ If McBride's video is considered (though appellant argues it was and should not be) at about 17:48, appellant is heard to say "Oh god its hot!", about 18:06:30 an officer agrees to let him get water from the jeep saying, "It's hot out like you said, wouldn't want you to get dehydrated."

[28]/ Or to move to the more profane, he testified he did not want to accuse Juan ("I didn't want him getting charged with a DWI if he was around. … He would go to jail if I would have said anything"), and believed he himself faced only a public intoxication because he was not driving. RR3-108-109.

29

-@18:19:30 "O: How did you end up here?
A: Um, driving?

O: So you were driving but what brought you to end up at this location?
A: I have no a/c in my vehicle, hot, this day I'm working a lot… I really, really don't know. I'm being honest with you."

But that is vague and ambiguous. It is merely a statement of the means by which he "end[ed] up there", i.e. by conveyance in a motor vehicle. It no more necessarily means he was the driver than someone saying they flew means they were the pilot. When the officer then asked again how he ended up at that specific location, he replied "really, really, don't know. I'm being honest with you." That seems to contradict the inference the State tried to draw. The officer easily could have but apparently did not follow up to make the meaning plain. It is much less clear than his other extrajudicial state-ment: "I did **not** drive either… Somebody drove me…" *Cf*., Ballard v. State, 757 S.W.2d 389, 390-391 & n.1(Tex. App.-Hou[1st]1988) pet. ref'd.[29]

In addition, that extrajudicial statement does not appear to be cor-roborated. A defendant's extrajudicial confession is not sufficient without other evidence that tends to establish the offense's corpus delicti. Hacker v.

---

[29]/ Appellant also testified that he did not mean it to be a statement that he was driving: "I didn't say I was driving. I was not driving the vehicle." RR3-77. In addition, if McBride's video is considered (though appellant argues it was and should not be) at about 17:57:20, the officer comments that appellant got sweaty from "driving around in the heat" but he twice replies "No.'

State, 389 S.W.2d 860, 865(Tex.Crim.App.2013). The corpus delicti of DWI is 1) driving a motor vehicle, 2) in a public place, 3) while intoxicated. A corroborated confession "may only be used in aid of evidence supporting an element of the corpus delicti. It may not be used to supply that element of the corpus delicti." Hanson v. State, 781 S.W.2d 445, 446(Tex.App.-Fort Worth1989), *abated* 790 S.W.2d 656(Tex. Crim.App.1990). When the proof in a DWI case is 1) a vehicle was driven/operated and 2) defendant was intoxicated, proof of the corpus delicti is incomplete without also showing 3) the defendant was the one who drove/operated it.

Thus, "the evidence is insufficient to establish the 'corpus delicti' of driving while intoxicated when the only evidence that the" defendant "was driving was his own extrajudicial confession." Bucek v. State, 724 S.W.2d 129, 130(Tex.App.-Fort Worth1987) no pet. *See also*, Onyekachi v. State, No. 05-12-00519-CR(Tex.App.-Dallas2013)[unpublished]; Folk v. State, 797 S.W.2d 141, 143-144(Tex.App.-Austin1990) pet. ref'd; Hanson, 781 S.W.2d at 446; Threet v. State, 157 Tex.Cr.R. 497, 250 S.W.2d 200, 200 (1952). A court "must reverse a DWI conviction when the evidence fails to corroborate an extrajudicial confession that the defendant was driving." Arocha v. State, No. 12-14-00042-CR(Tex.App.-Fort Worth, December 11, 2014)[unpublished].

This Court appears to say the contrary in Folk, 797 S.W.2d at 144. But, it also appears to be the only appellate court so holding. Appellant argues that holding was unnecessary and erroneous. It was unnecessary because the officer in Folk independently confirmed the details of the accident, thus corroborating the statement. *See*, Arocha and Bucek, *supra*. It also seems erroneous if it means an extrajudicial statement defendant was the driver need not be corroborated when it is the essential link between proof a vehicle was driven and the defendant was intoxicated to prove defendant thereby committed DWI. There is no proof of the corpus delicti in that case unless driving by the defendant is proved.

There seems to be no other evidence appellant was driving or operating the jeep when it was last seen moving almost 2 hours earlier. The callers did not see or describe the driver. Despite Poswalk's loose language, whoever drove by after they detained appellant could not have identified him **as the driver**. That person was male, but those who saw the driving were female. The only person it could have been was the one the third caller referenced, but they did not see the car until it was already parked there over an hour. Nothing connected any observed damage to the driving, as Poswalk said.

Hanson held corroboration was absent where the evidence showed police investigated an accident where a car stuck a utility pole, they found defendant on the shoulder of the road beside it, and she told them she was driving and admitted drinking 3 beers. The court reversed because "[t]he State did not introduce any other evidence to show" she "drove the car." *Id*., at 447.

The evidence corroborating extrajudicial statements in other cases does not appear to be present. *See e.g.*, Arocha, *supra*; Bucek 724 S.W.2d at 130; *also*, Onyekachi, *supra; cf.,* Scillitani v. State, 297 S.W.3d 498, 501 (Tex.App.-Hou[14th]2009), *rev'd*, 315 S.W.3d 542(Tex.Crim.App.2010).[30]

In Folk, *supra*, this Court states that the car "was registered to the person with whom" defendant "lived is some evidence corroborating" his "admission that he was driving the car on the night in question." 797 S.W.2d at 144. Appellant did testify he owned the Jeep. But, he would argue that **alone** should not constitute corroboration. Zavala v. State, 89 S.W.3d 134, 137 & n.5(Tex.App.-Corpus Christi2002) no pet., citing Folk held the evidence defendant was buying and took possession of the car, **along with** "the condition of the vehicle" was sufficient corroboration.

---

[30]/ Holding a false denial of drinking alcohol by defendant did "not constitute independent evidence".

### 3. **Murray v. State.**

There are a long line of cases dealing with sufficiency for DWI on facts like these. Those finding sufficient evidence appear to have more than is present in this case.

A recent case is Murray v. State, No. PD-1230-14(Tex.Crim.App., April 15, 2015). The Court stated: "The sole question for our review is whether 'a driver who is passed out behind the wheel of a **running** vehicle [is] 'operating' it for purposes of DWI?" *Slip* at 2. It did not answer that, but did find the evidence sufficient for operating. *Slip* at 2 n.1 & Meyer, J, dissenting. That defendant was found alone, asleep in the seat of his pick-up, parked partly on an improved shoulder and partly in a driveway, with the engine running, the transmission in park and the radio on. He was "very intoxicated" and admitted having drunk "a little." There was no one else in the vehicle, no evidence of anyone else in the area, and no alcoholic substances or containers were found in the vicinity.

The court of appeals held the evidence insufficient to prove he "oper-ated his vehicle while intoxicated." Murray v. State, 440 S.W.3d 927, 929 (Tex.App.-Amarillo2014). The Court of Criminal Appeals disagreed:

> "Based on Appellant's admission that he had been drinking, [the officer's] testimony that Appellant appeared 'very intoxicated' and the fact that no alcoholic beverages were found in the vicinity, a factfinder could have reasonably inferred that Appellant consumed

alcoholic beverages to the point of intoxication somewhere other than where he was found. Furthermore, because Appellant was the only person found in the area, a factfinder could have also reasonably inferred that Appellant drove his vehicle to the location at which he was found after drinking to intoxication."

Murray does not resolve appellant's case because, first, that vehicle's engine operating when defendant was found intoxicated in it, while the jeep was not being operated in any way when appellant was seen in it or for over an hour and a-half before that. Thus, unlike Murray, there is no basis to infer it was driven or operated recently, and thus from his later presence in it that he must have been the one recently driving it, or from his being intoxicated at 6:00 p.m. that he must have driven it while intoxicated almost 2 hours earlier.

Second, in Murray the Court repeatedly noted "no alcoholic beverages were found in the vicinity", while in appellant's case the officers found 2 empty 24-ounce beers in the center console and 3 unopened beers in a cooler in the jeep. Two 24-ounce beers are equivalent to 4 'regular' sized, and enough to cause intoxication when drunk in an hour and a-half. *See*, *Texas DWI Detection and Standardized Field Sobriety Test Program: Student Manual* (Revised 01/ 2002) at II-13, 16.[31] There is no basis to infer from his

---

[31]/ A 12-ounce beer, 4-ounce glass of wine and shot of whiskey "are all the same", have about one-half ounce of ethanol. A 175-pound man who drinks four 12-ounce beers on an empty stomach will have a blood alcohol content "above 0.08", "it doesn't take very

being found intoxicated in the jeep that he must have driven it there after drinking to intoxication.[32]

Third, in Murray the defendant was found on the shoulder of a rural highway, with no one else in the vicinity. In contrast, appellant was found in a busy, full parking lot by a large residential home, and testified Juan had told him he drove there and went to visit someone. Rather, than being no one else around, the video shows many others even in the hour or so the officers were there. Arguably there is some evidence supporting inferences there was another person in or near the car near the time of the third call, as defense counsel argued.

**4. Insufficient to prove driving or operating.**
Avants v. State, 170 Tex.Crim. 308, 340 S.W.2d 817(1960), found insufficient "to show that the appellant drove the automobile" evidence when the officer

> "first saw the appellant, she was slumped down in the front seat of an automobile… that had been involved in an accident with another automobile on a public street; and that she was alone in the automobile with the doors close and its right front badly damaged."

Keenan v. State, 700 S.W.2d 12, 14(Tex.App.-Amarillo1985) no pet.,

---

much alcohol to impair someone: 'a couple of beers' can do it." This Court can take judicial notice of this. *See and cf.,* Emerson v. State, 880 S.W.2d 759(Tex.Crim.App.1994).
[32]/ Giddings also testified "the other officers said they were cold to the touch", Poswalk said the 3 in the cooler were cold.

distinguished <u>Avants</u>: "in that case there was no testimony that the defendant was alone in the vehicle prior to the collision." There is likewise no evidence appellant "was alone in the vehicle prior to the collision." Nor are the other facts on which <u>Keenan</u> relied present (witness saw defendant in drivers seat on road with "exhaust coming from the tailpipe" "a couple of minutes" before collision).

In <u>Kuciemba v. State</u>, 310 S.W.3d 460, 462(Tex.Crim.App.2010), the defendant admitted driving at the time of the accident and the court noted he was found behind the wheel at the scene, still bleeding "support[ing] an inference that the accident had occurred a short time previously." *Id*. at 463.

<u>Hearne v. State</u>, 80 S.W.3d 677, 680(Tex.App.-Hou[1st]2002), states: "that the truck was in a moving lane of traffic, the engine was running," defendant "was in the driver's seat, the truck was registered to" defendant, "and no other person was nearby, the fact finder could reasonably infer that appellant was 'operating' his truck."

<u>Wright v. State</u>, 932 S.W.2d 572(Tex.App.-Tyler1995) no pet., found sufficient evidence defendant was the driver where a witness watched the car being driven until police arrived and saw the driver was the only occupant and person to get out after it stopped, and police saw him in the driver's seat of the stopped car with his foot on the brake. *Id*., 574-575.

**5. Insufficient to prove, if driving, that he was intoxicated when doing so.**

Kuciemba reaffirmed that "there must be a temporal link between the a (sic) defendant's intoxication and his driving", but it can be supported by circumstantial evidence. 310 S.W.3d at 462. Thus, it is not sufficient merely that he is found intoxicated and in his car, even if the evidence on driving was sufficient.[33]

Kuciemba was found intoxicated in the driver's seat of a truck involved in a one-car rollover. He told police he had fallen asleep. The evidence was held sufficient because 1)

> "[b]eing intoxicated at the scene of a traffic accident in which the actor was a driver is some circumstantial evidence that the actor's intoxication cause the accident, and the inference of causation is even stronger when the accident is a one-car collision with an inanimate object"

2) no alcoholic beverages or containers were found in the truck or at the scene, 3) lack of skid marks indicated a failure to brake which was some evidence the accident was caused by intoxication, 4) he was found behind the wheel at the scene, visibly still bleeding "support[ing] an inference that the accident had occurred a short time previously", and 5) a BAC "more than twice the legal limit found in a sample taken at the scene, supports an

---

[33]/ Unlike appellant's case, there was no question in Kuciemba defendant had been driving, the issue was when in relation to his being found intoxicated.

inference either that" the accident (and thus driving) was recent or "he had been intoxicated for quite a while."  "**The combination of these facts is sufficient**…"  *Id.*, at 461-463. *See also*, Scillitani v. State, 315 S.W.3d 542 (Tex.Crim.App.2010).

In Chaloupka v. State, 20 S.W.3d 172(Tex.App.-Texarkana2000), pet. ref'd, the court stated:

> "The State had to prove not that Chaloupka was intoxicated when the state trooper arrived, but that he had been intoxicated while driving on a public roadway.  The trooper's testimony alone presents no proof that Chaloupka was driving while intoxicated.  However, it constitutes a part of an accumulation of evidence."

*Id.*, at 175.  It was held sufficient because the car was followed after the collision to a rest area only a few miles away where defendant was seen getting out on the driver's side. Id., at 174-175.

Appellant did not admit driving after drinking, the jeep's engine was not running, and the keys were not even in the ignition.  It was parked in a parking lot, well off the road.  It had been there almost 2 hours.  He did nothing to attempt to operate it when the officers woke him. *Compare also*, Youens v. State, 988 S.W.2d 404, 407-408(Tex.App.-Hou[1st]1999) no pet.; Milam v. State, 976 S.W.2d 788, 789(Tex.App.-Hou[1st]1998) pet. ref'd; Wright, 932 S.W.2d at 574.While he owned the Jeep, there is no logic in that

making it more or less probable he was DWI. Driving someone else's car would not make it less probable.[34]

## POINT OF ERROR NO. TWO: THE TRIAL COURT REVERSIBLY ERRED BY DENYING APPELLANT'S MOTION FOR MISTRIAL.

### 1. Record.
The following occurred before the jury during State's cross of

appellant (at RR3-86-:

"Q Well, let's talk about what happened since this arrest. **Since this arrest, you've been in jail**, haven't you?
A Yes, sir.

Q Okay. **And that's been on a parole hold**, correct?
A That's been for this.

MS. HINDERA: Your Honor —
THE COURT: Please approach.

---

[34]/ *See also*, <u>Ballard</u>, *supra*, holding it insufficient where the defendant was found slumped, unconscious and intoxicated in the driver's seat of a car parked on the side of a highway opposite a gas station, with the engine was running. He admitted he had operated a motor vehicle, and had been drinking but denied being intoxicated. "There was no testimony concerning how long the car had been parked…; how long" defendant "had been intox-icated; how long" he "had been in the car; who had parked the car; whether" defendant "was intoxicated before or at the time the car was parked; or the ownership of the car." 757 S.W.2d at 390-391.

Some cases discount <u>Ballard</u> as based on the defunct 'alternate reasonable hypo-thesis' construct. *See e.g.*, <u>Rodriguez v. State</u>, No. 01-08-01038-CR(Tex.App.-Hou[1st] September 29, 2009)[unpublished]; <u>Feinberg v. State</u>, No. 05-06-01367-CR(Tex.App.-Dallas, November 20, 2007)[unpublished]; <u>Barton v. State</u>, 882 S.W.2d 456, 458(Tex. App.-Dallas1994) no pet. But, the opinion itself does not mention the construct or appear to use its reasoning. In addition, those cases find sufficient evidence for operating at the time of intoxication because of facts like the engine running, often with the car in gear and defendant's foot on the brake, and usually in the road or on the shoulder, if not more facts suggesting operating then or shortly before. *See*, <u>Rodriguez</u>, <u>Feinberg</u>, <u>Barton</u>, all *supra*.

(At the Bench, on the record.)

THE COURT: That's inadmissible.

MR. OHUERI: Your Honor, it can be — we can go under the felony conviction, Your Honor.

THE COURT: Not for just any reason.

MR. OHUERI: It goes to the truthfulness, Your Honor.

THE COURT: He hasn't been asked whether he was truthful. And you're not supposed to just ask if they're incarcerated. You can -- it's only to show a pertinent trait of his character, or motive, opportunity, intent, preparation, plan, knowledge, identity, mistaken –

MR. OHUERI: It's willing to go to his motivation to be a —

THE COURT: No, that's not the kind of motivation — that's not what that's about. No, that's not what it's about.
Now, I really can't allow you to go down that road.

MS. HINDERA: The door was not opened, I don't believe —

THE COURT: Well, no, it was not. It was definitely not.
And it could be serious error. So the appropriate way to do this is to — well, first continue to ask him the regular questions. If you have evidence that he is not being truthful, and somehow it relates to a previous offense, I don't — I'm looking at this.

MR. OHUERI: Your Honor, a felony conviction can be used for impeachment purposes.

THE COURT: Not — not necessarily. Not necessarily. I pulled this out because I was afraid that's where you might be going.”

RR3-86-88.

The jury was excused and things continued thus:

"THE COURT: So you're looking — okay. So you're looking at which — well, I'm looking at Rule 404.  Okay. You're looking at impeachment.

MR. OHUERI: Yes, Your Honor. Your Honor, on incidents like this —

THE COURT: You've got to give me the rule.

MR. OHUERI: Yes, Your Honor. It's Rule 609(a).

THE COURT: I'm looking at — sorry. Here we go.
(Short pause.)
Okay. The way you go about doing that, one, you're not supposed to refer to him being in jail. That's cardinal Rule, okay. That's why we have them dressed out. What you would do — you have to actually ask him if he has been convicted. And at this point, I think we ought to do it outside the presence of the jury. And you have to — do you have a record of that conviction? Do you have the —

MR. OHUERI: All I have right now, Your Honor, is his criminal history.

THE COURT: Okay. Okay. So —

MR. OHUERI: But also, Your Honor, although this was not stated on the record, prior to trial, at the bench, defense counsel did mention that she wanted to get into everything, including the criminal history. And that's why I felt there was some license with that; that statement was made.

THE COURT: I don't remember her saying that she wanted — I think — I think that Ms. — she said that her client wanted to — wanted everything out in the open.  I don't recall her quite saying --

MS. HINDERA: I think that was with regard to the —
THE COURT: — the jury selection.

MS. HINDERA: -- video.

THE COURT: So let's go ahead and just have a little quick hearing off the record -- I mean on the record, outside the presence of the jury. And I need you to ask those questions with regard to a felony conviction."

RR3-88-89.

Defense counsel then moved for a mistrial:

"MS. HINDERA: And, Your Honor, I'd be moving for a mistrial at this point. I think the jury has been provided with information that, even if it's — if they're instructed not to consider it, then they are still hearing that he's incarcerated, he's been incarcerated since June 9, which suggests that he's not been eligible for a bond or bail, that he's on parole. It could be for anything from another DWI to murder. And I don't think that the jury will have a, I guess, an unbiased mind, at this point, going in to the verdict phase because of the introduction of questions that are now unanswered.

THE COURT: Here's what I'm going to do. I'm not sure if that's reversible error or not. I mean, obviously, I can instruct the jury to disregard that information. I don't know whether — and so I'm not prepared to rule on your motion right this minute.

Let's go ahead and hear this testimony and then I need to give it a little thought.

MR. OHUERI: Your Honor, as to that, as far — just under Rule 609, as far as the prejudicial and probative value, of course, yes, Your Honor, it is prejudicial to show that he's in jail. But the probative value goes to the defendant's version of the facts. He essentially opened up a new story about an individual named Juan.

THE COURT: Well, that's all appropriate for cross-examination. And I don't think necessarily having the conviction makes it more probative that his story is false. But let's go ahead and hear this first.

RR3-89-90.

The State then took appellant on voir dire.[35]

The discussion between trial court and counsels then continued thus:

"THE COURT: Okay. So the questions about whether he has a felony conviction, and, specifically, a conviction for bribery, I think could be relevant for impeachment. But the questions regarding his motivation to lie, I'm not persuaded. It's motive to commit the offense. It's not about motive to get up and not tell the truth on the stand, is my understanding, okay, of — I don't think you can impeach him with why he desires to go to trial on this case. You can only impeach him with the actual felony conviction for bribery, which is a crime of moral turpitude. So I can allow the testimony that he has been convicted of bribery, but the whole line of questioning about him being on parole, and that being some sort of motivation to lie, I don't think you can — I'm not going to allow that.

MR. OHUERI: Your Honor, the State will respectfully disagree. But I think the issue of just bribery, that information coming in, is fine at this point. The State can move on.

THE COURT: We can look at it again later in another, you know, outside this trial. But I don't think that that's admissible.

MS. HINDERA: Your Honor, **I would re-urge the mistrial** because we can't take back from the jury the information that he's already — that he's been in custody and that he's on parole. And I —

MR. OHUERI: Your Honor —

THE COURT: I ~ Go ahead.

---

[35]/ Eliciting that he had felony convictions in 2007 for bribery and "multiple" for burglary of a building, most recently in 2000. RR3-91. It also elicited that he was currently on parole for "burglary and bribery, both", for "[a]bout four and a half more months I'll be finished." *Id*. Finally. "just for" the prosecutor's "view and understanding", it elicited that the Parole Board could revoke his parole, "Q And a negative outcome in this case could negatively affect the outcome of whether you'll have to continue the rest of your sentence in jail, correct? A Correct." RR3-91-92.

MR. OHUERI: Your Honor, just with that, the prejudice comes from knowing that he has a conviction; the prejudice doesn't come from parole. I think any speculation from — the jury might think this is a large legal basis that they don't have. The prejudice comes from the conviction; that evidence is already out. And at this point, they don't even know what the crime is. We can let them know it's a crime of moral turpitude. Additionally, the fact that he got parole, Your Honor, showed that he had good behavior, to the extent that they are aware of the parole.

THE COURT: Yeah. I don't think we need to go down that road. Because — well, we don't really know that for sure.

Okay. I am — as to your motion, I'm going to deny it because I don't have time to do much else. And my ruling stands that you are allowed to question him. I am going to tell the jury that they are to disregard the last — the last question from the prosecutor and the defendant's response. And then Mr. Ohueri can ask the question again, about whether he has any — a felony conviction in 2007, I guess it's noted, for bribery. Okay?

MS. HINDERA: And, Your Honor, we'll be able to go into — if you're going to allow it, that there haven't been any parole violations? I mean, if we're going to —

THE COURT: We're not going into parole.

MS. HINDERA: If you're going to allow the bribery to come in, then his good works, as Mr. Ohueri said, is something that the jury would probably not really understand, because the typical juror's not going to understand parole, or being on parole, and revocation of parole. So if Mr. Newberry has been out for how many —

THE WITNESS: Three years at this point.

MS. HINDERA: Three years without any violations, I think that is at least going to his –

THE COURT: Well, if you're saying — if you're not going to object to the admission of that evidence - -

MS. HINDERA: If you're going to let in the, you know, going to say the bribery is allowable, then the parole -- the fact that he' s not been revoked from parole and he's been successful for three years out in the world, I think is relevant.

THE COURT: If you're not going to object to that, then I don't think we have — then there's really no objection. Because —

MS. HINDERA: Well, I still object to the fact that he's been –

THE COURT: Being held in jail.

MS. HINDERA: Yes.

THE COURT: So, specifically, your objection, then, is only as to the fact that he is currently incarcerated.

MS. HINDERA: Yes.
And I think since it's already out in front of the jury, we'll have to have some time to explain why, you know -- what the nature of parole is and how, by virtue of this very charge, that's what's holding him. And that until this case is resolved, which it could have been, you know, with the 15-day offer , he's going to be held in for another 30 to 60, to maybe even 90 days, before parole comes out to have a hearing for him. I mean —

THE COURT: This is why I don't want to go down this road. It's a never-ending road. This is — and it's — none of it is relevant. His parole status —

MS. HINDERA: Right. And I didn't bring it up. That's why I didn't — whenever I was questioning him with Mr. Newberry, I did not bring it up.

THE COURT: Exactly.

His parole status is — it's — we don't know what allegations exist. You don't have anything from the parole officer. So we have nothing right now. We don't know if he's been picked up on parole or not before, and we're not going to know that. And I think it's — so I'm going to stand on my ruling that we are not going into parole. The only testimony is whether or not he has had a prior felony conviction that could be used for impeachment purposes.

MS. HINDERA: So you're allowing that in, but not allow me to question him as to the result of that bribery conviction, his sentence?

THE COURT: That he went to prison and he got out and that he's out on parole? Boy.

MR. OHUERI: Your Honor, the State's not going to object to the limited leeway on that, as far as he was on parole when he got out. The State's not going to object to that. The State understands and agrees with where you're coming from in going down the rabbit trail. But if it'll appease defense counsel, State's fine with that coming in. And State also — I won't follow up on that, Your Honor.

THE COURT: You won't what?

MR. OHUERI: I won't follow up on that, as far as the parole issue.

MS. HINDERA: But the bribery issue is going to be out, and it's all premised on the question regarding his being in custody and being —

THE COURT: Well, I'm going to tell them to disregard that. And I understand what you're saying, that it's kind of hard to put that back in. But I — but I — I think I need to instruct the jury to disregard the response and let Mr. Ohueri start over.

MS. HINDERA: Could we stipulate that he was on parole and was successful on parole? No revocations until this —

THE COURT: I don't know how we can — we don't know that. I don't know that the State would stipulate to that because the State doesn't know that.

MR. OHUERI: Yes, the State can't stipulate to that.

THE COURT: You can't stipulate to that.

MR. OHUERI: I can't stipulate to that.

MS. HINDERA: Maybe we need to recess for tomorrow so I can get the parole officer up here.

THE COURT: Well, I'm not going to do that. I'm not doing that. Definitely not doing that. We've got to go forward. Yeah. No, we're not going down that road right now.

RR3-92-98.

The trial court then ruled as follows:

"THE COURT: Okay. So here's what I will say. I am still denying Ms. Hindera's motion for a mistrial. My ruling stands that the question about him being incarcerated is going to be stricken and I'm going to instruct the jury to disregard that question and answer.
You are, of course, now allowed to ask the question about his prior bribery conviction, prior felony bribery conviction. You are not allowed to ask about parole.
If Ms. Hindera wishes to raise that issue in her redirect, then that would open the door to your ability to further expound on his status on parole. …"

RR3-98-99.

Once the jury returned the trial court instructed them thus:

"THE COURT: Ladies and gentlemen of the jury, I'm going to ask that you disregard **the last question and response**. That would be

Mr. Ohueri's question and Mr. Newberry's response. Mr. Ohueri, you may proceed."

RR3-99.

The State's cross then continued.

**B. Argument.**
   **1. By eliciting this evidence the State violated appellant's rights to due process, fair trial and the presumption of innocence.**

The State's action was impermissible in two ways: 1) eliciting that appellant was incarcerated and had been "[s]ince this arrest", and 2) that it was because of "a parole hold" "for this" case. The trial court recognized **both** were highly improper and prejudicial, and agreed with defense counsel that the door "was definitely not" opened.

> "Among the most precious rights afforded an accused is the right to be tried before an impartial jury with the presumption of innocence fully intact and free of prejudice."

Brown v. State, 877 S.W.2d 869, 870(Tex.App.-San Antonio1994) no pet.

State actions that inform the jury the defendant is in custody violate the rights to due process, fair trial and the presumption of innocence because they are "indicia of guilt", create "jury bias" and "prejudices a jury natural-[ly] feels from the inference that" his guilt has already been decided. *See*, Oliver v. State, 999 S.W.2d 596, 598-599(Tex.App.-Hou[14th] 1999) pet. ref'd; Brown, 877 S.W.2d at 871. *See also*, *Tex.CodeCrim.Proc.*, Arts. 2.03

(b) & 38.03.

Thus, compelling a defendant to wear jail clothes during trial violates these rights because it communicates that he is in custody. *See*, <u>Estelle v. Williams</u>, 425 U.S. 501, 512-512, 96 S.Ct. 1691 (1976); <u>Randle v. State</u>, 826 S.W.2d 943, 945-946(Tex.Crim.App.1992). The same is true for use of re-straints, e.g. handcuffs, shackles, etc. *See*, <u>Brown</u>, *supra*; <u>Deck v. Missouri</u>, 544 U.S. 622, 630, 125 S.Ct. 2007 (2005).

But, these rights are also violated when the State introduces or elicits evidence that defendant is in custody: it is not the clothing or the restraints which violate these rights. Thus, eliciting evidence that the defendant was in jail during trial "can invalidate" these rights. <u>Pierce v. State</u>, 234 S.W.3d 265, 268 (Tex. App.-Waco2007) pet. ref'd. *See also*, <u>Sharper v. State</u>, 22 S.W.3d 557, 558-559(Tex. App.-Texarkana2000) no pet., *cf*., <u>State v. Pringle</u>, No. 12-12-00286-CR(Tex.App.-Tyler, June 23, 2013)[unpublished], affirming suppressing video portion of statement showing defendant in jail clothes. This would seem particularly true of telling the jury that he has been in jail since the arrest for the alleged offense. *See*, <u>Holloway v. State</u>, 446 S.W.3d 847, 855(Tex.App.-Texarkana2014) no pet..

The evidence elicited by the State's first question did precisely that: telling the jury appellant had been in custody since his arrest on this case.

The trial court was therefore correct to note in response to appellant's objection that "you're not supposed to refer to him being in jail. That's cardinal Rule". Just as restraints during trial, proof appellant has been incarcerated since arrest creates

> "the prejudice a jury naturally feels from the inference that the court has already decided that the Defendant is not only guilty, but also dangerous and untrustworthy."

Brown, 877 S.W.2d at 871.

It is likewise very prejudicial for the State to deliberately elicit that parole had placed a hold on him because of this case. It explicitly suggests that a state authority, the parole board, had determined he was guilty, as well as informing them that he was parole at the time of the incident.

**2. The trial court erred by denying the motion for mistrial.**
Denial of a mistrial is reviewed on an abuse of discretion standard.

*See*, Coble v. State, 330 S.W.3d 253, 292(Tex.Crim.App.2010). The test requires balancing three factors: 1) severity of the misconduct (magnitude of the prejudicial effect), 2) curative measures by the trial court (efficacy of any cautionary instruction), and 3) certainty of conviction absent the mis-conduct (strength of the evidence supporting conviction). *See*, Hamilton v. State, No. 14-08-00175-CR(Tex.App.-Hou[14th]2010)[unpublished](citing Archie v. State, 221 S.W.3d 695, 700(Tex.Crim.App.2007)).

### a. Severity of the misconduct.

The rights violated by this error are "bedrock", "basic component[s]" of and essential to a fair trial and due process of law. *See*, Oliver, 999 S.W. 2d at 598-99; Brown, 877 S.W.2d at 870; Randle, 826 S.W.2d at 945 & n.3; Wiseman v. State, 223 S.W.3d 45, 50(Tex.App.-Hou[1st]2006) pet. ref'd. It was flagrant, violating a "cardinal Rule" as the trial court put it. This was not merely an unanswered question or passing comment. *Compare*, Holloway, 446 S.W.3d at 856. It was not ambiguous and was immediately followed by a question repeating that he was incarcerated and adding the parole hold. *Compare*, Pierce, 234 S.W.3d at 265. It was not otherwise admissible. *Compare*, Pierce, *supra*.

### b. Curative measures.

There was **no** curative instruction as to the evidence **that appellant had been in jail since his arrest.** The trial court did give an instruction to disregard **but it was explicitly limited to "the last question and response", which was only about the parole hold**.

> "THE COURT: Ladies and gentlemen of the jury, I'm going to ask that you disregard **the last question and response**. That would be Mr. Ohueri's question and Mr. Newberry's response. Mr. Ohueri, you may proceed."

RR3-99. It did not include the question and answer before that: i.e.,

Q. Well, let's talk about what happened since this arrest. Since this arrest, you've been in jail, haven't you?
A. Yes, sir."

When courts consider giving an instruction to disregard a sufficient 'cure' it is because they ordinary presume a jury follows cautionary instructions. *See*, <u>Archie v. State</u>, 340 S.W.3d 734, 741(Tex.Crim.App.2011). But the corollary that juries only disregard what the court tells them to is also true. The instruction to disregard applied only to the parole hold and left the jury free to consider and use against appellant that he had been incarcerated since arrest and the natural inferences from that that he had already been determined guilty, dangerous and untrustworthy. *See and cf.*, <u>Hamilton</u>, *supra*. The trial court did not even rule on the objection before the jury.

This distinguishes case like <u>Holloway</u>, where it was only an unanswered question by the prosecutor and there was an extensive instructive specifically addressing it. 446 S.W.3d at 855-56. *See also*, <u>Madden v. State</u>, No. 02-08-007-CR(Tex.App.-Fort Worth2009[unpublished]; <u>Pierce</u>, 234 S.W.3d at 268; <u>Sharper</u>, 22 S.W.3d at 559.

Further, the instruction given on the parole hold was not sufficient to cure. The natural inference was that appellant had already been found guilty by a State agency and the defense offered in this trial already disproved.

That bell is simply too loud to unring. The trial court expressly refused all attempts by the defense to explain anything about parole to minimize its prejudicial effect. RR3-94-99.  It also refused a short continuance to secure testimony from the parole officer to do so. RR3-98.  As was said in Oliver about a curative instruction on jail clothing: "There is a point where we 'should not be ignorant as judges of what we know as men." 999 S.W.2d at 599.  Jurors can not be expected to know the intricacies of parole (e.g., a hold may not in fact require adjudication, the lesser burden of proof for revocation, etc.).

Indeed, the law recognizes that mention of parole can be so prejudicial that, even after a guilty verdict, the jury in an applicable case must be instructed it may consider it only in an very narrow sense. *See*, *Tex.Code Crim.Proc.,* Art. 37.07, Secs. 4. *See also*, Hamilton, *supra*.[36]  In addition, unlike in Hamilton, the State **did** elicit evidence suggesting he was incarcerated because parole had already determined that he was guilty.

Further, the State' s cross after the instruction started by reminding the jury that he had felony convictions, necessarily echoing the parole infor-

---

[36]/ "However, the State had already elicited, without objection or instruction disregard, testimony suggesting appellant had been in custody since his arrest.  There, despite the trial court's instruction, **we cannot necessarily conclude the jury disregarded** any reference to appellant's incarceration."

54

mation. RR3-99. It twice elicited that he did not tell the officers about Juan or Ann when he was arrested, then repeated that it had been "[a]lmost two months" since the incident. RR3-100, 102. It then attempted to question him on what he and his attorney had spoken about, but objection to invading lawyer-client communications was sustained. RR3-102. It's next question again repeated "that 60 days" since arrest, but drew another objection. RR3-103. The remaining two pages of cross did not mention the time or days since arrest, but the point had been made in the preceding 4 pages.

### c. **Conviction was not a certainty.**

Appellant would argue conviction was not certain, even if the evidence is found legally sufficient. *See*, *Point of Error No. 1*, *supra*.

### 3. The error was not harmless beyond a reasonable doubt

This error is of constitutional dimension, violating appellant's rights to due process, fair trial and the presumption of innocence. Thus, conviction must be reversed "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Tex. RApp.Proc.,* Rule 44.2(a). *See and cf.*, Wiseman v. State, 223 S.W.3d at 51; Oliver, 999 S.W.2d at 600; Brown, 877 S.W.2d at 871; Randle, 826 S.W.2d at 946 & n.13.

It seems highly unlikely error in denying a motion for mistrial would be harmless under Rule 44.2(a). The analysis for whether that was error is

similar to that for harmless constitutional error. *See*, <u>Hawkins v. State</u>, 135 S.W.2d 72, 77(Tex.Crim.App.2004).  Thus, cases finding harmless error tend to be those where the record suggested the jury was not aware of the complained of indicia of guilt. *See*, <u>Brown</u>, 877 S.W.2d at 871-72; <u>Mendoza v. State</u>, 1 S.W.3d 829, 830(Tex.App.-Corpus Christi1999) pet. ref'd; *compare*, <u>Wiseman</u>, *supra*.  *See also*, Randle, 826 S.W.2d at 946 [additional circumstances].  That is not the case here.

## PRAYER FOR RELIEF

For the reasons stated, appellant asks the conviction and sentence be set aside, an acquittal entered or the case be remanded for a new trial.

RESPECTFULLY SUBMITTED,
/s/ Christopher P. Morgan
Christopher P. Morgan
State Bar No. 14435325
3009 N. IH 35
Austin, Texas 78722
(512) 472-9717 // FAX:  472-9798
chrismorgalaw@cs.com
ATTORNEY FOR APPELLANT

**CERTIFICATE OF SERVICE:** I, Christopher P. Morgan, hereby certify a true copy of the foregoing Motion was served on the Office of the County Attorney for Travis County, Texas on June 9, 2015, by mail to P.O. Box 1748, Austin, Texas 78767.

/s/ Christopher P. Morgan
Christopher P. Morgan

**CERTIFICATE OF WORD COUNT:** I, Christopher P. Morgan, hereby certify the word count of this brief, excluding matters in *Tex.R.App.Proc.,*

Rule 9.4(i)(1), is 15000 or less.

/s/ Christopher P. Morgan
Christopher P. Morgan